
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **JOHN J. LAU** | § | |
| xxx-xx-6993 | § | Case No. 11-40284 |
| **and DEBORAH Y. LAU** | § | |
| xxx-xx-1436 | § | |
| | § | |
| Debtors | § | Chapter 7 |
| KUN YU | § | |
| and XIUMIN MU | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | Adversary No. 11-4189 |
| | § | |
| JOHN J. LAU | § | |
| and DEBORAH Y. LAU | § | |
| | § | |
| Defendants | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

Upon trial of the complaint filed by the Plaintiffs, Kun Yu and Xiumin Mu (the "Plaintiffs") seeking a determination of whether an alleged debt owed to them by the Defendant-Debtors, John J. Lau ("Lau") and Deborah Y. Lau (collectively, the "Defendants"), is dischargeable, the Court issues the following findings of fact and conclusions of law. The Plaintiffs contends that the debt is non-dischargeable under the

---

[1] These findings of fact and conclusions of law are not designated for publication and shall not considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case or as to other applicable evidentiary doctrines.

alternative grounds set forth in 11 U.S.C. §523(a)(2)(A) and §523(a)(6).[2] After the trial, the Court took the matter under advisement. This decision disposes of all issues pending before the Court.

## FINDINGS OF FACT

1. Plaintiff, Kun Yu, was an engineer at Mactronix, Inc., a non-debtor entity that once manufactured equipment for the semi-conductor industry. Mactronix was a closely-held corporation owned and/or controlled by the Debtor-Defendant, John J. Lau, who served as its president.[3]

2. By the mid-1990s, Lau had also become involved in the buying and selling of unimproved tracts of real property, primarily through the procurement of option contracts on unimproved tracts of real property.[4]

3. Though Lau generally created a separate business entity to hold contractual rights for each particular real estate venture, as well as legal title to real property if eventually acquired, the financial ability of those particular entities to engage in such activities were facilitated by funds borrowed from various individuals by Lau and entities controlled by Lau.[5]

---

[2] The Plaintiffs' claims under 11 U.S.C. §727 and §523(a)(4) were previously dismissed by the Court for the reasons expressed in that certain"Order Granting in Part and Denying in Part Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) and Denying Motion for More Definite Statement" entered in this cause on January 27, 2012.

[3] Ex. 48, consisting of notes to certain financial statements of the Debtor-Defendants, indicates that Mactronix was owned "98% by the JYL and NYL Children's Trusts, which is controlled by John Lau. The remaining 2% is owned by John & Debbie Lau."

[4] Though not extensively explored in the evidence offered in this case, the Court is cognizant that, generally speaking, the JNC business plan was to compete against larger real estate acquisition companies by paying larger amounts in unrefundable earnest money deposits to potential sellers of large real estate tracts and by truncating the closing deadline to lure potential sellers to choose its offer. While a particular option contract was pending, the particular JNC entity would attempt to market particular parcels of the referenced tract in order to determine the overall financial viability of the project.

[5] These funds supplemented any funding secured from lending institutions.

4. One of those entities was JNC Enterprises, Ltd. ("JNC"), for which the Defendants each served as a general partner.

5. Rather than giving the investors actual participation interests constituting an actual ownership interest percentage in JNC itself, or in any particular real estate venture or entity for which JNC might seek funding, thereby diluting the potentially significant returns that might otherwise be realized by the Defendants upon a successful sale of property, JNC created a lender-borrower relationship with its "investors."

6. JNC procured such investment amounts by offering substantially higher rates of return on funds lent to the company — rates that were substantially higher than would otherwise be available in the marketplace.

7. In early 1996, Lau, on behalf of JNC, offered Mactronix employees the opportunity to loan funds to JNC on an unsecured basis that would ostensibly be used for procurement of option contracts or activities pertaining thereto.[6]

8. The Plaintiffs first loaned money to JNC in April 1996.[7]

9. The Plaintiffs initially invested the sum of $11,000.00 to JNC under an "Investment Program Agreement" for a period of 12 months for a fixed rate of return of 13%.[8]

10. The Investment Program Agreement did not specify a purpose for the use of the invested sums nor did it purport to relate to any particular asset nor the activities of any specific company. It was an unsecured loan of money.

11. In that month, the Plaintiffs also loaned JNC the sum of $12,015.50 under a "Promissory Note" with a term of one year, to be repaid at 13% simple interest. The Note also gave the Plaintiffs the option of demanding early payment upon 45

---

[6] Ex. 50. Similar opportunities were subsequently offered. See, e.g., Ex. 45-46.

[7] Though Kun Yu's wife, Xiumin Mu, joined as a plaintiff in this action, she did not sign any of the relevant documents nor did she otherwise actively participate in the actual transactions with JNC, though she is listed in certain notes as a payee and she likely had a community interest in the investment funds tendered to JNC by Mr. Kun.

[8] Ex. 51. The "guarantee" language utilized in the agreement was superfluous since it was issued by the very entity to which the sums were tendered.

days' written notice. The Note was executed by Lau as the managing general partner of JNC.[9]

12. That began a series of loans to JNC by the Plaintiffs — some constituting renewed promissory notes involving sums previously loaned to JNC by the Plaintiffs — while others constituted new infusions of money to JNC by the Plaintiffs.

13. Over a 13-year period, between May 30, 1996 and August 21, 2009, there were 48 promissory notes executed by JNC in favor of Mr. Kun, in increasing amounts, with a majority of the notes maturing at the end of 12 months from the execution date.[10]

14. For at least a 12-year period, from 1996 to 2008, JNC and its sister entities that benefitted from its investment solicitations, enjoyed significant business success and, for most of that period, possessed a sound financial foundation with available cash.

15. JNC made payments to the Plaintiffs on particular note obligations on two occasions — once in 2000 and again in 2003 — in the approximate aggregate amount of $78,000.

16. In all other instances, during periods when cash would likely have been available to JNC, the Plaintiffs continued to elect to re-invest such sums with JNC through 2006 through the execution of renewal notes, rather than demanding repayment of their previously-invested sums upon the repeated maturity of the particular obligations, or by taking legal action to compel such payment.

17. Additionally, the Plaintiffs kept loaning new sums of money to JNC, again at high interest rates, through the execution of various promissory notes through 2006, and even though Mr. Kun left employment with Mactronix in 2001.

18. Thus, the Plaintiffs made ongoing, successive financial decisions to keep their money invested with JNC.

---

[9] Ex. 52.

[10] ¶ 3(b) of the Stipulated Statements of Fact set forth in the approved Joint Pre-Trial Order entered in this adversary proceeding on March 13, 2013. See generally, Ex. 1-44 and 52.

19. Mr. Kun admitted that he did not devote serious attention to the business activities of JNC nor inquire as to the uses of invested funds prior to 2006.

20. After he experienced a serious illness in 2006, Mr. Kun retired and, according to his testimony, made "countless" demands upon JNC for payment.

21. However, even after 2006, the Plaintiffs never made a formal written demand for payment of any particular promissory note upon its maturity, nor did they ever initiate legal action to enforce payment of the obligations under any particular promissory note.

22. In fact, between 2006 and 2008, the Plaintiffs elected to pursue "renewed" note obligations nine (9) times, involving substantial amounts of money,[11] and the Plaintiffs also began in that period to accept payment terms longer than 12 months.[12]

23. Unfortunately for everyone concerned, the credit market collapsed in the fall of 2008, and that collapse had a severe economic impact upon real estate development, the willingness (or ability) of parties to engage in new development projects, and it precluded any refinancing of any real estate owned by any Lau-controlled entity.

24. The collapse of the real estate investment market soon followed and JNC no longer possessed the necessary cash flow to honor the debt commitments that it had previously issued, including the remaining debt commitment to the Plaintiffs.

25. Yet in 2009, perhaps with an awareness that no better alternative existed since JNC did not possess the cash assets to pay the accrued and outstanding indebtedness, JNC and the Plaintiffs consolidated all existing promissory notes between the parties into two new promissory notes, each at 4% for a stated maturity period of six months. One renewal note was in the principal amount of $351,557.42[13] and the second in the principal amount of $287,127.62.[14]

---

[11] See, e.g., Ex. 34-42.

[12] See, e.g., Ex. 37, 41 and 42.

[13] Ex. 43.

[14] Ex. 44.

26. The real estate investment market only worsened and, on January 28, 2011, the Defendants filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in this Court.

27. The claim of the Plaintiffs was properly scheduled as an unsecured claim in the Defendants' bankruptcy case.[15]

28. On August 4, 2011, the Plaintiffs filed a general unsecured claim in the Defendants' underlying chapter 7 case in the amount of $675,817.27.[16]

29. The claim amount is still due and owing by Defendant John Lau to the Plaintiffs.

30. The Plaintiffs have failed to present any credible evidence that Defendant Deborah Lau took any affirmative action resulting in a loss to the Plaintiffs.

31. The Plaintiffs have failed to present any credible evidence that Defendant Deborah Lau had any active participation in the solicitation of funds from the Plaintiffs nor in the execution of promissory notes by JNC in favor of the Plaintiffs.

32. The Plaintiffs have failed to present any credible evidence that, at the time that the debt was created, Defendant Deborah Lau acted with the specific subjective intent to cause injury to the Plaintiffs.

33. The Plaintiffs have failed to present any evidence that, at the time that the debt was created, any action of Defendant Deborah Lau created an objective substantial certainty of harm to the Plaintiffs.

34. The Plaintiffs have failed to establish by a preponderance of the evidence that any debt owed to them by Defendant John Lau was procured under circumstances constituting actual fraud.

35. Despite limitations with the English language, Mr. Kun is an intelligent, educated man who had exercised diligence to save a considerable sum, and he was willing to take risks in order to obtain the extravagant rate of interest offered by JNC in its promissory notes.

---

[15] Schedule F filed by the Debtors on February 18, 2011 [dkt #17] in case no. 11-40284.

[16] ¶ 3(i) of the Stipulated Statements of Fact.

36. Mr. Kun's intelligence and education belie any conclusion that he blindly believed that his anticipated returns under the notes were "guaranteed" by law or by some third party source (as opposed to payment from JNC as the actual maker of the notes), or that he could obtain such an extravagant return on his money while still enjoying absolute protection of his principal amounts.[17]

37. The motivations of Mr. Kun to invest initially, and his willingness to continue to invest his family savings over a period of nearly ten years, were more likely based upon the perceived economic successes of Mr. Lau and his companies, Mr. Kun's desire to share in such financial successes, and also perhaps upon the cultural expectation that Mr. Lau would go to extraordinary lengths to avoid any default of his obligations.

38. The repeated and continued willingness of Mr. Kun to invest additional (and considerable) sums of money with JNC, years after he had made his initial investments, and his continuing pattern over a series of years to "roll the note" upon maturity of the promissory notes, indicate that he was not induced to invest, either initially or subsequently, by any fraudulent misrepresentation.

39. The Plaintiffs have failed to establish by a preponderance of the evidence that Defendant John Lau made representations to Plaintiff Kun Yu that such Defendant knew were false at the time that such representations were made.

40. The Plaintiffs have failed to establish by a preponderance of the evidence that Defendant John Lau made false representations to Plaintiff Kun Yu with the intention and purpose of deceiving the Plaintiffs.

---

[17] Any casual reference by the parties to a promissory note or an investment program agreement as a "CD" has no legal significance. The Texas Business & Commerce Code formally defines a "certificate of deposit" as "an instrument containing an acknowledgment *by a bank* that a sum of money has been received by the bank and a promise *by the bank* to repay the sum of money. A certificate of deposit is a note of the bank." 2 TEX. BUS. & COMM. CODE §3.104(j) (Vernon Supp. 2012) (emphasis added). The perceived reduction in risk is engendered by the perceived financial soundness of the borrower-bank, as undergirded by financially sound deposit insurance programs, not by the generic use of the terminology. In noting the "fundamental difference between a certificate of deposit and an unsecured loan," one court observed:
> Certificates of deposit are generally F.D.I.C. insured – risk of nonpayment does not exist. While individuals technically loan money to a bank when a certificate of deposit is purchased, it is the safest 'unsecured' loan imaginable and therefore a lower rate of interest is paid. However, unsecured loans are typically made at a much higher rate of interest because risk of nonpayment is greater.

*In re Blondheim Real Estate, Inc.*, 91 B.R. 639, 642 (Bankr. D.N.H. 1988).

**Page 7 of 13**

41. The Plaintiffs have failed to establish by a preponderance of the evidence that Defendant John Lau appropriated any funds from the Plaintiffs with a fraudulent intent.

42. The Plaintiffs have failed to establish by a preponderance of the evidence that, at the time that the debts were created, Defendant John Lau acted with the specific subjective intent to cause injury to the Plaintiffs.

43. The Plaintiffs have failed to establish by a preponderance of the evidence that, at the time that the debts were created, the actions of Defendant John Lau created an objective substantial certainty of harm to the Plaintiffs.

44. Certainly the obligations under the consolidated promissory notes have been breached, thereby creating a debt for which each Debtor-Defendant is personally liable due to their managerial capacities with JNC.

45. The Plaintiffs have certainly suffered a substantial financial loss and, given the ages and retirement status of the Plaintiffs, and the palpable distress felt by Mr. Kun over the loss of a significant portion of his life savings, the circumstances surrounding these economic losses place the Plaintiffs in a most sympathetic light.

46. The degree of sympathy the Court may feel, however, cannot be substituted for the required degree of proper proof necessary to except this particular debt from the scope of the discharge granted to the Defendants, particularly in light of the Bankruptcy Code's directive that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor.

47. To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

## CONCLUSIONS OF LAW

1.  This Court has subject matter jurisdiction under 28 U.S.C. §§1334 and 11 U.S.C. §523. This Court has personal jurisdiction over the parties to this adversary proceeding.

2.  This Court has authority to enter a final judgment in this adversary proceeding since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(I) and (O) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

3.  In seeking to except the debt owing to them from the scope of the discharge granted to each Debtor-Defendant, the Plaintiffs assume the burden of proof under a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

4.  All exceptions to discharge under §523 "must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start."[18] *In re Hudson*, 107 F.3d 355, 356 (5th Cir. 1997).

5.  However, the Fifth Circuit has noted that there are limits to the maxim that exceptions to dischargeability are to be construed narrowly in favor of the debtor, particularly in situations falling under an exception to dischargeability in a case in which a debtor has committed fraud. *See generally Deodati v. M.M. Winkler & Associates (In the Matter of: M.M. Winkler & Associates),* 239 F.3d 746, 751 (5th Cir. 2001).

*Nondischargeability Under 523(a)(2)(A): Debt Arising by Fraud, False Pretenses, or False Representation*.

6.  The Plaintiffs' Complaint seeks a determination that the debt owed to them should be excepted from discharge under §523(a)(2)(A) as a debt obtained by false pretenses, a false representation or actual fraud.

7.  11 U.S.C. §523(a)(2)(A) of the Bankruptcy Code provides that:

---

[18] However, a fresh start is not promised to all who file for bankruptcy relief, but only to "the honest but unfortunate debtor." *Grogan*, 498 U.S. at 286-87.

>    a discharge under §727 of this title does not discharge an
>    individual debtor from any debt for money, property, or
>    services, ... to the extent obtained by false pretenses, a false
>    representation, or actual fraud, other than a statement
>    respecting the debtor's or an insider's financial condition.

8. Section 523(a)(2)(A) encompasses similar but distinct causes of action. Though other circuits have applied a uniform standard to all § 523(a)(2)(A) actions,[19] the Fifth Circuit has distinguished the elements of "actual fraud" and of "false pretenses and false representations." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995).

9. The distinction recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event, as opposed to a representation regarding a past or existing fact. *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir.1991) [A debtor's promise ... related to a future action which does not purport to depict current or past fact ... therefore cannot be defined as a false representation or a false pretense].[20]

---

[19] *See, e.g., Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987). Though some bankruptcy courts outside of the Fifth Circuit have cited the decision of the United States Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351(1995), in support of their proposition that all of the §523(a)(2)(A) actions are governed by the elements for actual fraud, *see, e.g., AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr. W.D. Mo. 1997); *AT& T Universal Card Services v. Alvi (In re Alvi),* 191 B.R. 724 (Bankr. N.D. Ill. 1996); the Supreme Court in that case was actually distinguishing the language used in §523(a)(2)(A) from that utilized in §523(a)(2)(B) in order to determine the degree of reliance necessary above mere reliance in fact in order to exempt a debt from discharge under (a)(2)(A). Since the Supreme Court specifically refused to even apply their direct holding regarding the degree of reliance in actual fraud cases to cases of false pretense or false representation, 116 S.Ct. at 443, n. 8, the statement that the Court erased all distinctions between the three (a)(2)(A) actions strains credibility.

[20] While "false pretenses" and "false representation" both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement. *See Walker v. Davis (In re Davis),* 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007); and *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003). In order for a debtor's representation to constitute a false pretense or a false representation, it "must have been: (1) [a] knowing and fraudulent falsehood, (2) describing past or current facts, (3) that [was] relied upon by the other party." *In re Allison*, 960 F.2d at 483; *see also In re Bercier*, 934 F.2d at 692 ["to be a false representation or false pretense under § 523(a)(2), the false representations and false pretenses must encompass statements that falsely purport to depict current or past facts"].

10. Because any representation by Lau regarding JNC's future fulfillment of its obligations arising under a particular debt instrument, or the Plaintiffs' expectations arising therefrom, pertained to a future event, any such statement cannot be properly characterized as a false representation or a false pretense in this Circuit.

11. Thus, the validity of the Plaintiffs' claim under §523(a)(2)(A) in this case rests upon sufficient proof that the debt was obtained by actual fraud.

12. To have a debt excepted from discharge pursuant to the "actual fraud" provision in § 523(a)(2)(A), an objecting creditor must prove that:
    (1) the debtor made representations;
    (2) at the time they were made the debtor knew they were false;
    (3) the debtor made the representations with the intention and purpose to deceive the creditor;
    (4) the creditor justifiably relied on such representation; and
    (5) the creditor sustained losses as a proximate result of the representations.

    *Pentecost*, 44 F.3d at 1293, *as modified by the United States Supreme Court decision of Field v. Mans*, 516 U.S. 59 (1995) [regarding the proper standard of reliance].

13. As to Ms. Lau, though a debt may be determined to be non-dischargeable for fraud as to an innocent debtor based upon a spouse's fraudulent conduct when imputed under agency principles based upon a business relationship between the spouses, *Tummel & Carroll v. Quinlivan (In re Quinlivan)* 434 F.3d 314, 318 (5th Cir. 2005), *Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277, 1282 (5th Cir. 1992), any fraud perpetrated by one spouse could not be imputed to the other spouse based solely upon the existence of a marital relationship. *Tower Credit, Inc. v. Gauthier (In re Gauthier)*, 349 Fed. App'x. 943, (5th Cir. 2009).

14. It is widely recognized that "[a] promise to perform acts in the future is not a qualifying misrepresentation merely because the promise subsequently is breached." *Woo, Inc. v. Donelson (In re Donelson)*, 410 B.R. 495, 503 (Bankr. S.D. Tex. 2009) (citing *Allison,* 960 F.2d at 484). A breach of contract "is not sufficient to make a debt non-dischargeable, even though there is no excuse for the subsequent breach." *Turbo Aleae Inv., Inc. v. Borschow (In re Borschow)*, 454 B.R. 374, 395 (Bankr. W.D. Tex. 2011)(citing *Bercier*, 934 F.2d at 692).

15. Because the Court concludes that the Plaintiffs have failed to prove by a preponderance of the evidence that the amounts which they tendered to JNC were obtained by actual fraud, judgment must be rendered for each Debtor-Defendant on this §523(a)(2)(A) claim.

*Nondischargeability Under §523(a)(6):*
*Debt Arising from Willful and Malicious Injury*

16. The Plaintiffs further contend that the debt owed to them should be excepted from discharge as a debt arising from a willful and malicious injury inflicted upon them by the Debtor-Defendants.

17. Section 523(a)(6) of the Bankruptcy Code provides that:

    (a) A discharge under Section 727 . . . of this title does not discharge an individual debtor from any debt . . .

    (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

18. In *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the United States Supreme Court significantly narrowed the scope of debts that could be deemed nondischargeable under §523(a)(6).

19. The *Geiger* decision clearly requires that an actor inflict a deliberate or intentional injury, not merely that an actor take a deliberate or intentional act that leads to injury.

20. As subsequently interpreted by the Fifth Circuit, a recovery under §523(a)(6) for a "willful and malicious injury" now requires proof that such injury arose from a deliberate and intentional act by a debtor that was inflicted under circumstances evidencing either: (1) an objective substantial certainty of harm; or (2) a subjective motive to cause harm. *Miller v. J. D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998), *cert. denied, Miller v. J.D. Abrams, Inc.*, 526 U.S. 1016 (1999); *see also Caton v. Trudeau (In re Caton),* 157 F.3d 1026, 1029 (5th Cir. 1998).

21. The "objective substantial certainty" prong "is a recognition of the evidentiary reality that defendants rarely admit malicious intent. A court is thus expected to analyze whether the defendant's's actions, which from a reasonable person's standpoint were substantially certain to cause harm, are such that the court ought to infer that the debtor's subjective intent was to inflict a willful and malicious injury on the plaintiff." *Mann Bracken, LLP v. Powers (In re Powers)*, 421 B.R. 326, 334-35 (Bankr. W.D. Tex. 2009), *citing In re Vollbracht*, 276 Fed. Appx. 360 (5th Cir. 2007).

22. The Plaintiffs have failed to demonstrate by a preponderance of the evidence the existence of a deliberate or intentional injury inflicted upon them by either Defendant, and they have additionally failed to demonstrate by a preponderance of the evidence that the actions of either Defendant created an objective substantial certainty of harm to them.

23. Thus, the Plaintiffs have failed to sustain their burden of proof that any purported debt arose from a "willful and malicious injury" as contemplated by §523(a)(6).

24. Because the Court concludes that the Plaintiffs have failed to prove their cause of action under either of the relevant subsections of §523(a) by a preponderance of the evidence, judgment must be rendered for the Debtor-Defendants in this action.

25. To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

26. An appropriate judgment shall be entered consistent with these findings and conclusions.

Signed on 05/28/2013

_____
THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE